**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Gary DeWayne Johnson

      v.                               Civil No. 07-cv-161-PB

Angela Poulin, et al.[1]

**REPORT AND RECOMMENDATION**

Before the Court is Gary DeWayne Johnson's civil rights complaint, filed pursuant to 42 U.S.C. § 1983 and the Americans With Disabilities Act, 42 U.S.C. 12132, et seq. ("ADA"). Johnson alleges that the defendants violated a number of his constitutional and statutory rights and retaliated against him for having exercised his constitutional rights.[2] The matter is

---

[1]Johnson has named the following defendants to this action: Northern New Hampshire Correctional Facility ("NCF") Media Generalist Angela Poulin, NCF Hearings Officer Paul Fortier, NCF Unit Manager Robert Thyng, NCF Maintenance Supervisor Joseph Bachofer, NCF Major Dennis Cox, NCF Warden Larry Blaisdell, and New Hampshire Department of Corrections ("DOC") Commissioner William Wrenn. In addition, I find that, while they are not listed in the caption of his action, Johnson also intended to name the following people as defendants to this action: DOC employee Christopher Kench, NCF Sargeant Wilson (first name unknown ("FNU")) and NCF Corporal FNU Mailhot.

[2]Johnson has filed a complaint (document no. 1) and several amendments to the complaint (document nos. 5, 8, 10 & 12-15).

before me for preliminary review to determine, among other things, whether or not plaintiff has stated any claim upon which relief might be granted.   See United States District Court for the District of New Hampshire Local Rule ("LR") 4.3(d)(2)(A). For the reasons explained fully herein, in an Order issued simultaneously with this Report and Recommendation (the "Simultaneous Order"), I direct that the following claims be served against the following defendants: (1) a denial of the right of access to the courts claim for disallowing Johnson's research of "inappropriate" phrases, against Thyng, Blaisdell, Wrenn, Kench, Wilson, Poulin, and Mailhot; (2) a due process violation claim for banning Johnson from the NCF law library,

---

These documents, in the aggregate, will be construed to comprise the complaint in this matter for all purposes.  Johnson is advised, however, that future amendments to his complaint should comply with Local Rule 15.1, which states, in relevant part:

> (a) A party who moves to amend a filing shall (i) attach the proposed amended filing to the motion to amend, (ii) identify in the motion or a supporting memorandum any new factual allegations, legal claims, or parties, and (iii) explain why any new allegations, claims, or parties were not included in the original filing.

> (b) Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, shall reproduce the entire filing as amended and may not incorporate any prior filing by reference, except by leave of court.

against Thyng; (3) a denial of access to the courts claim based on the denial of access to legal research materials or a legal assistant proficient in the law against defendants Thyng, Cox, and Blaisdell; (4) an endangerment claim against defendant Bachofer; (5) a failure to protect claim against Thyng; (6) a denial of adequate mental health care claim and an ADA claim against Thyng; (7) a denial of hygiene items claim against Thyng and Blaisdell; and (8) a state law defamation claim against Bachofer.  I also recommend the following claims be dismissed: (1) the official capacity claims; (2) the violation of due process in disciplinary proceedings claim; (3) the denial of a right of access to attorney disciplinary hearing claim; (4) the denial of access to the courts based on the denial of typewriter ribbons claim; (5) the equal protection claim; and (6) the loss of prison employment claim.

### Standard of Review

Under this Court's local rules, when an incarcerated plaintiff commences an action pro se and in forma pauperis, the magistrate judge is directed to conduct a preliminary review.  LR 4.3(d)(2).  In conducting the preliminary review, the Court construes pro se pleadings liberally, however inartfully pleaded.

See <u>Erickson v. Pardus</u>, ___ U.S. ___, 127 S. Ct. 2197, 2200 (2007) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) and <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972) to construe pro se pleadings liberally in favor of the pro se party).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."  <u>See Castro v. United States</u>, 540 U.S. 375, 381 (2003) (noting that courts may construe pro se pleadings so as to avoid inappropriately stringent rules and unnecessary dismissals of claims); <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997) (same).  All of the factual assertions made by a pro se plaintiff and inferences reasonably drawn therefrom must be accepted as true.  <u>See id.</u>  This review ensures that pro se pleadings are given fair and meaningful consideration.

<u>Background</u>

<u>Allegations Related to Johnson's Use of the Law Library</u>

Johnson is an inmate at the Northern New Hampshire Correctional Facility ("NCF").  On March 6, 2007, Johnson was researching legal issues relative to challenging his criminal conviction on the NCF law library's "Lexis" computerized legal

4

research system.  To conduct legal research with Lexis, users
enter certain keywords or, if known, identifying citations, to
search for legal cases and other legal writings related to the
subject matter the user seeks to research.  On March 6, Johnson
was researching the definition of sexual penetration.  To that
end, and in reference to the facts of his own criminal case,
Johnson entered the search term "licked her anus," presumably to
determine whether statutory definitions of penetration included
that act.  Johnson was approached by Micah Fullerton, an inmate
employed as a law library clerk.  Fullerton told Johnson that
both Fullerton and Angela Poulin, the NCF librarian, monitored
the legal searches done on the Lexis system.  Fullerton further
advised Johnson that the term he was searching would be
considered inappropriate by Poulin, and that Johnson should
discontinue the use of such terminology.  Johnson alleges that
Fullerton went on to report Johnson's search to Poulin.  Poulin
wrote a disciplinary report against Johnson concerning the
incident.[3]

---

[3]The disciplinary report charged Johnson with disobeying a
posted order that the use of "inappropriate terminology" was
forbidden.  The order was deemed "posted" because it was stated
on a sign-in sheet in the library.

Several days after the March 6 incident in the library, Johnson was discussing the New Hampshire rape-shield statute[4] with another inmate, Christopher Cremeans.  Cremeans told Johnson that there was a specific case on the topic that Johnson was researching.  Cremeans could not remember the name of the case, but he did remember that the case included the term "masturbated a bull."[5]  Johnson searched for the case by entering that phrase as a search term in the library's Lexis system.  Again, Fullerton saw the phrase that Johnson was using and reported the incident to Poulin.  Johnson explained to Poulin that the phrase was used in order to identify a specific case in furtherance of permissible legal research.  Poulin, however, had Johnson removed from the library by NCF Corporal Mailhot.  Poulin then wrote up a second disciplinary infraction report for Johnson concerning this incident.

---

[4]A "rape-shield" law prevents a criminal defendant from inquiring into an alleged rape victim's consensual sexual history absent a particularized showing that the information sought is relevant and material, and that admission of that evidence is necessary to protect the defendant's constitutional right to confront the evidence against him and to a fair trial.  See Black's Law Dictionary 1410-11 (8th ed. 2004) ("Shield Law").

[5]The case in question, State v. Howard, 121 N.H. 53, 426 A.2d 457 (1981) is a case explaining New Hampshire's rape-shield statute.  The Howard case contains the phrase "masturbating a bull."  Id. at 55.

As a result of the two disciplinary charges, and before any hearing was held on the charges, Johnson was barred from using both the law library and the recreational library, and was prohibited from using the law library to receive copies of legal documents or to have documents notarized.  On March 13, 2007, defendant Thyng, Johnson's Unit Manager, told Johnson that this restriction was in place because Johnson's conduct had identified Johnson as a security risk to the institution.  Thyng further informed Johnson, as a convicted sex offender, he should not be using a computer at all.  Thyng also accused Johnson of signing onto the library computer under other inmates' names and searching for inappropriate materials.

Johnson denies those accusations and asserts that no evidence or other documentation to substantiate them has ever been produced, despite his numerous requests for such information.  Johnson asserts he has not been charged with any such act.  Finally, Johnson contends that despite Thyng's claims that he is a security risk, he has remained classified as a medium custody, "C-3," inmate.  Johnson grieved the pre-hearing denial of access to the libraries to both NCF Warden Larry Blaisdell and DOC Commissioner William Wrenn.  Both Blaisdell and

DOC employee Christopher Kench, acting for Wrenn, upheld the restrictions.

On March 14, 2007, NCF Sargeant Wilson, acting on Thyng's directive, did not allow Johnson to go to the library to have documents copied that had to be mailed to the New Hampshire Supreme Court by March 14 in order to be timely filed.  Johnson also requested that the appendix to his notice of appeal be bound, as required by New Hampshire Supreme Court rule.  The request was denied.

In addition, Poulin refused to notarize documents that had to be notarized and mailed to the Superior Court by March 18, forcing Johnson to file an emergency motion for an expansion of time in order to be able to file a motion to reconsider in the Superior Court.  Johnson's complaint indicates that he was provided with an alternative method of having something notarized by someone other than Poulin.  It appears, however, that this process was time-consuming and did not satisfy Johnson's time sensitive filing requirements.  The motion for an expansion of time was denied, and Johnson claims he was, therefore, unable to file a meritorious motion to reconsider in his Superior Court action.  Poulin also refused to notarize a document Johnson

needed sent to the New Hampshire Attorney Discipline office, where Johnson had a petition pending.  The petition was denied because Johnson did not file timely notarized paperwork.

On March 21, 2007, a disciplinary hearing was held on Johnson's charged violations of the legal research policy. Poulin testified against Johnson at the hearing.  She stated that even if Johnson was conducting legitimate legal research, that the use of the particular search terms in question was unnecessary to retrieve the cases he sought.  Poulin testified that Johnson failed to use alternative search terms, and failed to get advance permission to use the search terms in question.

Johnson requested that he be permitted to call Fullerton and Cremeans as witnesses at the hearing.  Although the NCF investigators, Corporals Primo and Massey and Sargeant Newton, interviewed those individuals, NCF Hearing Officer Fortier denied Johnson's request for their live testimony at the hearing. Fortier refused the request for witnesses because Johnson would not divulge in advance of the hearing what testimony he sought from the witnesses, which Fortier required to assure that the testimony would be relevant.

Johnson has attached to his complaint an affidavit written by Cremeans stating that the statement he gave to Newton was misrepresented at the disciplinary hearing.  Cremeans' affidavit says that while Newton reported that Cremeans had personal knowledge of Johnson's use of allegedly inappropriate search terms, Cremeans actually told the investigator that Johnson had discussed the March 6 incident, but that he did not have personal knowledge of what had transpired.  Cremeans also told Fullerton, at the time Johnson received the second disciplinary report alleging the use of inappropriate terminology, that he had told Johnson what phrase to use to search for the rape-shield case, and that Johnson was conducting legal research regarding the rape-shield law.  On March 12, 2007, Cremeans was questioned by NCF Corporal Primo and NCF Sargeant Massey.  Primo and Massey asked Cremeans why Johnson had wanted him as a witness at his disciplinary hearing.  Cremeans told the officers that he had suggested Johnson search for the phrase "masturbated a bull" in order to find a specific case , which he believed would be relevant to Johnson's research, but the name of which he could not remember.  Primo responded that the use of the phrase was

10

inappropriate.  Cremeans was not called as a witness at the hearing.

Johnson further asserts that he was told by NCF Major Dennis Cox that he would have to prove his innocence at the disciplinary hearing and on appeal.  Johnson argues that this requirement was imposed in violation of his due process rights.  In fact, Johnson was found guilty of the disciplinary infractions charged.  He was sanctioned with five days of punitive segregation, suspended for a period of ninety days, fifteen days loss of recreation time, ten days loss of canteen, and fifteen hours of extra duty.

Following the hearing, Johnson filed an appeal  in which he argued that the research terms were not offensive because they were terms that had been used in court opinions.  Additionally, Johnson argued, the terms used were all terms found in the dictionaries sold to inmates at the NCF canteen.  Johnson also argued that Poulin's rules about library usage are not official policy, and that Poulin herself was violating prison rules by allowing Fullerton, an inmate, to act in a supervisory position over other inmates.  The hearing officers's findings and sanctions were affirmed, however, and Johnson was advised that he had a right to appeal the denial to NCF Warden Blaisdell.

Johnson asserts that, in addition to the disciplinary sanctions imposed by Fortier, on March 26, 2007, Thyng formally barred Johnson from using the recreational and law libraries until May 21, 2007.  Johnson was warned that future violations could result in an indefinite restriction on Johnson's "privilege" to use the NCF libraries.  Johnson was told, however, that because he had litigation pending in the state courts, he could make a request for legal material by identifying in a request slip what document or specific case he needed, and attaching to that request both a request for photocopying and a cash withdrawal slip.  No provision was made to allow Johnson to conduct legal research in order to be able to identify what material he needed, or to otherwise have research conducted on his behalf.

Because he was barred from the law library, on March 28, 2007, Johnson requested that a person proficient in the law be appointed to assist him in conducting his legal research and preparing his cases.  Thyng responded on April 2 and asked Johnson to request a specific individual to assist him before Thyng would rule on the request.  On April 26, Johnson renewed his nonspecific request for a legal assistant to be provided by

the institution.  Cox, however, denied the request on April 27, stating that it was not the DOC's responsibility to provide Johnson with legal assistance.

Johnson asserts that his litigation efforts were thwarted because Cox denied him access to typewriter ribbons, which he needed to type documents submitted to the New Hampshire Supreme Court.  Cox responded that the deprivation was due to the canteen restriction that had been imposed, and that if he wanted canteen privileges, he would have to "control [his] behavior and act like an adlut [sic]."

Johnson also claims that, as a result of the disciplinary charges against him and the rumors that he used the identities of other inmates to search for child pornography on the library computer, he lost his job in the Maintenance department at NCF. Johnson held the job for three years prior to his termination, and had performed the job well.  The NCF Maintenance Supervisor, Joseph Bachofer, however, told a number of inmates that Johnson had been fired for "looking up child pornography" in the law library.  Johnson denies engaging in the uncharged acts, noting that inmates have no internet access other than the Lexis legal research system, which does enable someone to search for child

pornography.  Johnson has submitted a signed statement from
inmate Stephen Quartarone and an unsigned and unsworn statement
written by inmate Kerry Kidd[6], confirming that Bachofer was
spreading the "child pornography" rumor among the inmates.

On May 23, 2007, Johnson was allowed back into the law
library to have something notarized.  Johnson alleges that in an
act of retaliation, Poulin had Mailhot again remove him forcibly
from the library and taken to "the hole."  According to incident
reports submitted by Johnson with his complaint, Poulin reported
that she had asked him nicely to sit down and not to stand over
her shoulder while she notarized his documents, but Johnson
refused.  Johnson then ignored at least one direct order from
her, and one direct order from Mailhot, to sit down.  Only after
that refusal, Poulin and Mailhot claim, was Johnson removed.
Poulin then wrote up a disciplinary infraction report charging
that Johnson had failed to follow a staff person's order by
refusing to sit down, and had disrupted the library's operations
when his behavior necessitated his forcible removal from the
library.

---

[6]Johnson claims that the statement is unsigned and unsworn
because NCF staff intimidated Kidd so that he would not provide
Johnson with a sworn statement.

Johnson claims that as a result of Cox, Poulin, Thyng and Bachofer promulgating rumors about him searching for child pornography, his safety on his housing unit, where he had previously felt safe for several years, was compromised.  Johnson reports being threatened or warned to "watch his back" by inmates who had heard the rumors.  On June 11, 2007, Johnson was badly beaten by another inmate in the chow line.  Johnson was treated at the infirmary for a head laceration, a black eye, and a concussion.

After the June 11 incident, Johnson tried to request protective custody status.  Johnson claims, however, that when he attempted to file a request for protective custody with the Warden by submitting it to Thyng, that Thyng threatened to have him handcuffed and lugged to "the tank" if he did not sign a statement saying that he felt safe on Thyng's housing unit.  As a result, Johnson signed the statement.  On June 13, Johnson was denied protective custody status, because the Warden was confused by Johnson's conflicting assertions that he needed to be placed into custody for his own safety, and that he felt safe on his current housing unit.

Allegations Relating to Johnson's Mental Health

Johnson has been treated at the prison for mental illness for several years and had been placed on medication for depression, anxiety, and insomnia.  After the June 11 beating, Johnson's mental condition deteriorated as a result of the stress and anxiety caused by the incident, as well as the other events described above that preceded it.  Johnson requested to be fed in his cell, but NCF Sargeant Morin denied his request.

On July 16, 2007, Johnson's mental health provider, Judy Figueroa, prescribed him medication and authorized cell feeds for thirty days, because his mental condition had deteriorated. Figueroa's prescription for cell feeds was intended to treat his mental illness by reducing the stress Johnson experienced following the June 11 assault in the chow hall.  On July 17, 2007, Thyng cancelled the cell feed pass prescribed by Figueroa. Thyng also wrote a disciplinary infraction report accusing Johnson of manipulating the system in order to get a cell feed pass.  Johnson was also written up for a disciplinary infraction by NCF Lieutenant Loven, who accused Johnson of lying about the reason Figueroa had prescribed the cell feed pass.  Loven's reported basis for the infraction was that a woman named Heidi

who worked at the NCF infirmary, with whom Johnson was not familiar, reported to Loven that Johnson had gone to the infirmary with the sole purpose of getting a cell feed pass.

Johnson claims that these disciplinary write-ups were taken in retaliation for Johnson's pending litigation against the defendants in this Court.  Johnson further claims that his mental illness qualifies him as a disabled person, and that allowing cell feeds to help treat his mental illness was a reasonable accommodation to make for his disability.

Allegations Regarding Hygiene Products

On June 21 and 27, 2007, Johnson requested that the prison provide him with a supply of hygiene products, including toothpaste, soap, shampoo, and razors.  Johnson's written request explained that he had no money to purchase hygiene products from the canteen, because his inmate account was entirely depleted by the cost he incurred making copies of legal documents.  Johnson's request for hygiene products was denied.  In his June 22 denial, Thyng stated that Johnson had already received hygiene items. Johnson claims that at that time, all he had received was a single disposable razor.  Thyng again denied Johnson's June 27 request, stating that a hygiene bag had been provided to him a

week earlier.  Johnson claims, however, that he had been without
these items since June 21, and continued to be deprived of the
items entirely until Thyng provided him with two razors on July
6.  On July 11, Blaisdell responded to Johnson's grievance
regarding hygiene items, denying the request on the grounds that
a hygiene bag should last more than one week and accusatorily
inquiring whether Johnson had thrown the items away.  Johnson
developed sores and a rash because he was denied soap.  On July
17, 2007, Johnson received a disciplinary infraction report for
not shaving.

<u>Discussion</u>

I.   <u>Section 1983 Claims</u>

Section 1983 creates a cause of action against those who,
acting under color of state law, violate federal constitutional
or statutory law.  <u>See</u> 42 U.S.C. § 1983[7]; <u>City of Okla. City v.</u>

---

[7]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of
> the United States or other person within the
> jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law . . . .

Tuttle, 471 U.S. 808, 829 (1985); Wilson v. Town of Mendon, 294
F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held
liable under § 1983, his or her conduct must have caused the
alleged constitutional or statutory deprivation.  See Monell v.
Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); Soto v. Flores,
103 F.3d 1056, 1061–62 (1st Cir. 1997).  Here, Johnson claims
that the defendants, all state actors, have violated his federal
constitutional and statutory rights.[8]  Such claims, therefore,
arise under § 1983.

II.  Denial of Right to Meaningful Access to the Courts

Under the Due Process Clause of the Fourteenth Amendment,
prison inmates enjoy a right of access to the courts.  See Bounds
v. Smith, 430 U.S. 817, 828 (1977); Lewis v. Casey, 518 U.S. 343,
350–51 (1996); Carter v. Fair, 786 F.2d 433, 435 (1st Cir.
1986).[9]  States have an affirmative duty to ensure that inmates

---

[8]The claims identified in this Order will be considered for
all purposes to be the claims raised in this action.  If Johnson
disagrees with this identification of claims, he must properly
move to amend his complaint.

[9]The right of access to the Courts in the prisoner context
has been limited to certain types of lawsuits.  See Thaddeus–X v.
Blatter, 175 F.3d 378, 391 (6th Cir. 1999) (limiting a prisoner's
right to access the courts to direct appeals, habeas petitions,
and civil rights claims taken on prisoner's own behalf).  Here,
Johnson alleges that, among the legal cases interfered with, were
an action or actions challenging his underlying conviction, and a

have meaningful access to the courts.  Bounds, 430 U.S. at 832–

34; Wolff v. McDonnell, 418 U.S. 539 (1974), Johnson v. Avery,

393 U.S. 483, 485 (1969); Germany v. Vance, 868 F.2d 9, 14 (1st

Cir. 1989) (internal quotations omitted).  In order to assert a

denial of meaningful access to the courts, an inmate must allege

that he has suffered injury or prejudice to an underlying

nonfrivolous legal action.  Lewis, 518 U.S. at 351; Christopher

v. Harbury, 536 U.S. 403, 415 (2002).  Without such an injury, no

claim lies for a denial of access to the courts.  Lewis, 518 U.S.

at 351; Christopher, 536 U.S. at 415.

    The right of access "requires prison authorities to assist

inmates in the preparation and filing of meaningful legal papers

by providing prisoners with adequate law libraries or adequate

assistance from persons trained in the law."  Bounds, 430 U.S. at

828.  While a prison is not required to provide both an adequate

law library and persons knowledgeable in the law to assist

inmates, the institution must provide access to resources that,

---

matter before the state's attorney disciplinary committee.
Although I find that Johnson cannot maintain an action premised
on a denial of access to attorney disciplinary proceedings,
Johnson can base a denial of access to the courts claim on an
allegation that his efforts to bring a state court challenge to
his incarcerating conviction were adversely impacted by
defendants' actions.

in the aggregate, suffice to insure that inmates are not denied
the ability to conduct legal research, or prepare legal filings.
Bounds, 430 U.S. at 828; Cepulonis v. Fair, 732 F.2d 1, 6 (1st
Cir. 1984).  Although the right to meaningfully access a law
library is not absolute, for example, it may be restricted on
occasion when it might contravene an important security concern
of the prison, "when a state chooses to fulfill its Bounds
obligation . . . solely or primarily by providing access to a law
library, such access cannot be so attenuated as to be
meaningless."  Cepulonis, 732 F.2d at 4.  A procedure wherein an
inmate is not provided the opportunity to conduct research, but
is required to provide, in advance of receiving legal materials,
the specific case citation or publication sought, is "suspect,"
because "when inmates are unassisted by persons trained in the
law and must specify in advance the books which they wish to use
. . . [i]t is unrealistic to expect a prisoner to know in advance
exactly what materials he needs to consult."  Id. at 3–5.
Accordingly, where a prison restricts or eliminates access to an
adequate law library, the prison must provide adequate access to
some means by which an inmate can both conduct legal research to

identify necessary materials, and then obtain those materials.
Id. at 6.

Prison administrators may regulate inmates' legal research
and preparation of legal papers, as long as those restrictions do
not frustrate the inmates' ability to pursue legal claims.
Johnson, 393 U.S. at 486; Turner v. Safley, 482 U.S. 78, 89
(1987).  Regulations impacting the exercise of an inmate's
constitutional rights must be reasonable.  Turner, 482 U.S. at
89.  To be considered reasonable, a regulation must not be an
exaggerated response to a situation for which a more narrowly
tailored regulation would serve the same end.  Id. at 89-91.  In
Turner, the Supreme Court set out a four-factor test for courts
to use in determining whether a particular prison policy serves
legitimate penological objectives or is an exaggerated response
by prison officials: (1) whether the regulation is rationally
related to a legitimate and neutral government objective; (2)
whether the inmate has other avenues available to exercise the
right in question; (3) the impact that accommodating the asserted
right will have on prison guards, other prisoners, and the
allocation of prison resources; and (4) whether there is any
ready alternative to the regulation that will fully accommodate

the prisoners' rights at de minimus cost.  Id. at 87, 89-90.

Applying this test, I will examine the restrictions on Johnson's

right of access to the courts to determine whether or not an

actionable deprivation has been stated.

The policy in question here required that all inmates

conducting legal research must not transgress a rule prohibiting

the use of "inappropriate terminology" in the library.

Significantly, what constitutes "inappropriate terminology" is

not defined, but rather is left to the librarian's discretion to

determine whether a research term was  "appropriate" or not.  The

regulation further authorizes the librarian to censor an inmate's

research if she determines that a term is "inappropriate" and to

initiate disciplinary action against the inmate for employing

such terminology.  Johnson asserts that he attempted to conduct

research into whether or not particular acts, relevant to his

conviction, satisfied the definition of sexual penetration.  To

that end, he searched for legal cases including the phrase

"licked her anus," presumably on the basis that there was a

factual connection between that phrase and his criminal

conviction, which, in turn, Johnson presumably needed to either

actually litigate or in anticipation of potential litigation of

challenges to his conviction.  Poulin's second charge, based on Johnson's use of the phrase "masturbated a bull," also misunderstood his need to use that terminology.  Johnson attempted to find a specific case relevant to his underlying conviction, that he knew could be found by using that specific phrase, to efficiently conduct his legal research in light of his limited time in the law library.  Poulin denied Johnson's legal searches using those terms and, in both cases, filed disciplinary charges against Johnson for violating the "inappropriate terminology" regulation.

When confronted with the relevance of the search terms to research in furtherance of Johnson's pending litigation, Poulin opined that there were other ways to obtain the information sought.  It does not appear, however, that Poulin made any attempt to educate Johnson in conducting complex computerized legal research or in finding or providing him with the services of a person proficient in legal research, in order to conduct the research without the use of what she considered to be "inappropriate terminology."

The first Turner factor assesses whether or not the challenged regulation is rationally related to a valid

penological interest.  <u>Id.</u> at 89.  Prohibiting inmates from using
certain language may be rationally related to the legitimate
correctional goal of assuring that an inmate conducts himself in
a manner that is consistent with rehabilitation.  It may also hel
ensure that an inmate does not exploit the opportunity to use
computerized legal research to obtain cases whose fact patterns
might satisfy their prurient interests, or for anything other
than legitimate legal research.  This is particularly true in
instances where sex offenders might have access to potentially
sexually charged information.  Accordingly, I find that the
regulation in question, which requires the use of "appropriate
terminology" in conducting library research, to be rationally
related to a legitimate penological concern, satisfying the first
<u>Turner</u> factor.

     The second <u>Turner</u> factor requires the Court to determine
whether Johnson had other means by which he could exercise his
right to access the courts.  Based on the facts alleged here, I
find that he did not.  While Poulin asserted at Johnson's
disciplinary hearing that other searches would yield the same
results, it does not appear that any instruction or assistance in
conducting such an alternative search was provided, or even

offered, to Johnson.  To the contrary, when Johnson made a
specific request for a person knowledgeable in the law to assist
him, the request was denied on the basis that the prison does not
offer assistance to inmates in conducting legal research.
Further, to the extent that the prison's regulations, and the
restrictions imposed here, resulted in the removal of Johnson
from any direct access to the law library, he also was denied
access to any alternative means of obtaining information
regarding his legal claims.

The third and fourth Turner factors are concerned with the
impact of accommodating the asserted right on the prison's
personnel, inmates, and resources, and with whether or not some
less restrictive alternative to the regulation in question exists
that would satisfy the penological objectives furthered by the
challenged regulation.  Here, I find that accommodating the right
of an inmate to meaningfully access the courts, and the
concomitant right to conduct legal research, even by entering the
crude phrases at issue here, would not necessarily impact the
prison's operations, inmates, or employees.

To the extent that accommodating Johnson's right to conduct
research by entering these phrases into the Lexis system could,

however, impact prison operations, I find that with minimal
monitoring of an inmate's activities or gathering information
from the inmate regarding his litigation efforts, that impact
could be effectively eliminated.  In this case, for instance,
Johnson's explanation of why he was searching for these
particular terms, the nature of his underlying conviction, and
the fact that he had state court litigation pending challenging
that conviction, should suffice to demonstrate that Johnson was
not using the terms for an improper purpose.  Otherwise, Poulin
could determine that certain words, in and of themselves, were
always "inappropriate."  That amount of discretion enables
arbitrary decision making with no predictability of results or
assurance of reasonable policies being advanced.  I find that a
better definition of "inappropriate," as applied to terminology
used in legal research, takes into account not just the specific
phrase used, but the context in which it is employed.

     It is worth noting that had Johnson obtained the cases in
some other manner, in furtherance of his litigation, he would
still be in possession of exactly the same document, terminology
and all.  Prison officials would be hard-pressed to justify a
policy that prohibited sex offenders from researching cases

27

because they involved the facts of the offenses underlying those
cases.  The application of law to particular facts is, in fact,
the essence of legal research and advocacy.  To broadly restrict
inmates from researching cases containing certain kinds of facts,
therefore, will undoubtedly result in an improper limitation on
legal research for some inmates whose underlying convictions
involved less than wholesome facts.  It is likely that the only
difference in prison operations that would result in a rule less
prohibitive of explicit search terms, but that would serve to
stop inappropriate use of the computer, is that Poulin, or
another NCF employee, would have to ask an inmate a few questions
to determine if the suspect terminology was being legitimately
and appropriately utilized.  Accordingly, I find that the
regulation here, as alleged, may well be an exaggerated response
to a rational and legitimate penological concern, rendering the
regulation itself unreasonable.

Johnson has also adequately alleged that he was prejudiced
by the denial of access to the courts.  Johnson states that on
more than one occasion, he was denied relief in the state courts
as a result of his inability to make timely filings in cases

challenging his conviction.[10]  I find, therefore, that Johnson

has stated a claim upon which relief may be granted for denial of

meaningful access to the courts.  In my Order issued

simultaneously with this Report and Recommendation, I direct that

this claim be served on defendants Poulin, Thyng, Mailhott,

Blaisdell, Wrenn, Kench, and Wilson.

III. <u>Endangerment and Failure to Protect</u>

     The safety and security of all prisoners is protected by the

Constitution.  <u>See</u> <u>DeShaney v. Winnebago County Dep't of Soc.</u>

<u>Servs.</u>, 489 U.S. 189, 190 (1989); <u>Youngberg v. Romeo</u>, 457 U.S.

307, 315–16 (1982).  To state a claim upon which relief might be

granted alleging that the defendants failed to protect him,

Johnson must allege that the defendants were aware of and

deliberately indifferent to a serious risk to his safety at the

hands of other inmates.  <u>See</u> <u>Burrell v. Hampshire County</u>, 307

F.3d 1, 7 (1st Cir. 2002).

     Here, Johnson claims that Bachofer told a number of inmates

that Johnson had been involved in attempting to retrieve child

_____

     [10]I except from my finding of adequately alleged prejudice
Johnson's claim that the denial of typewriter ribbons by Cox
resulted in actual injury to a pending action.  Johnson has
alleged no such injury resulting specifically from the denial of
typewriter ribbons.  Accordingly, I recommend dismissal of that
discreet claim.

pornography on the library computer.  Johnson has submitted statements from two other inmates who report that Bachofer told them and other inmates that Johnson was looking for child pornography.  These types of rumors, in a prison setting, could readily put an inmate at risk for his personal safety, and a prison employee who engages in that type of rumor mongering is most likely ignoring a known serious risk to the inmate about whom he is spreading the information.  Accordingly, I find that Johnson has stated a claim against Bachofer for endangering his safety.  Johnson also claims that he believes these rumors were passed to Bachofer by Cox, Thyng, and Poulin.  Johnson's supposition, however, unsupported by facts, is insufficient to state a claim and I recommend dismissal of the endangerment claim against any defendant other than Bachofer.

Johnson continues by claiming that as a result of these rumors, he received many threats and, on one occasion, was badly beaten by an inmate who had heard the rumors.  The prison staff was aware of the beating, as Johnson required medical attention for a laceration, a black eye, and a concussion.  Johnson attempted to request protective custody status after he was beaten up.  Johnson claims that Thyng denied him that status by

threatening to have him placed in punitive segregation if he did
not withdraw his request and state that he felt safe on Thyng's
unit.  Accordingly, I find that Johnson has stated a claim
against Thyng for Thyng's intentional failure to protect Johnson
from a known risk to his safety.

To the extent that Johnson intends to press this claim
against Blaisdell, Wrenn, or any other supervisory individual, I
find that he has failed to do so.  The papers submitted by
Johnson indicate that the supervisory personnel at NCF were
willing to place Johnson into protective custody, but that they
were confused by the lack of a clear request for a transfer.
Accordingly, I cannot find that they, personally, denied Johnson
protection from a known risk, or that they had a policy that
prevented Johnson from receiving safe housing.  I recommend that
the failure to protect claim be dismissed, therefore, against any
defendant other than Thyng.

IV.  <u>Due Process Violations</u>

In <u>Wolff</u>, the Supreme Court identified the due process
requirements for a disciplinary hearing in a prison.  418 U.S. at
564.  Those requirements include written notice of the charges at
least twenty-four hours in advance of the hearing, the ability to

31

call witnesses and present evidence, and that the hearing be presided over by an impartial decisionmaker.  Id. at 566, 570-71; Surprenant v. Rivas, 424 F.3d 5, 16 (1st Cir. 2005).  Ordinarily, however, when a prisoner is subjected to a disciplinary sanction, he must first demonstrate that the sanction itself was so atypical of the normal incidents of prison life, and thus imposed such a hardship, that he was entitled to due process in order for the sanction to be constitutionally effected.  Sandin v. Conner, 515 U.S. 472, 483-84 (1995).

Here, Johnson was charged with disciplinary violations for his library searches on two separate occasions.  Even accepting as true, as I must at this stage of proceedings, that Johnson was improperly denied the ability to call witnesses and present evidence at his hearing, I cannot find that the sanctions he received, extra duty time, a loss of recreation and canteen time, and five days in segregation suspended for ninety days, were atypical of the normal incidents of prison life.  Accordingly, I recommend dismissal of the claim alleging that the failure to allow Johnson to call witnesses at a disciplinary hearing violated his due process rights.

Johnson goes on to claim, however, that in response to the disciplinary finding, and in addition to the sanctions imposed by Fortier after the hearing, Thyng created an additional sanction for the library incident, as well as in response to uncharged and unproven allegations of other misconduct.  Thyng's additional sanction was to ban Johnson from the law and recreational libraries prior to the disciplinary hearing held, and then, without conducting any additional due process hearing, or participating in the first hearing, extending the ban for two months.  Thyng also threatened Johnson with a threat of indefinite suspension for any future misbehavior.  This was not a sanction imposed pursuant to a due process hearing by a hearings officer who heard and decided the matter, but a restriction independently imposed on Johnson by his unit manager.  This restriction denied Johnson access to legal research, copies, and timely notarization of materials for its duration.  I find that denying Johnson the ability to conduct legal research and engage in a state court challenge to his conviction may well be a hardship that exceeds the normal incidents of prison life, much as it exceeded the sanctions imposed by the disciplinary hearings officer after a hearing.  Accordingly, I find that Johnson has

33

stated a due process claim against Thyng for denying him adequate process prior to rescinding his law library privileges, and I will direct service of this claim against Thyng in my Simultaneous Order.

V.   Denial of Adequate Mental Health Care

The Eighth Amendment protects prison inmates from prison officials acting with deliberate indifference to their serious medical needs.  See Farmer v. Brennan, 511 U.S. 825, 831 (1994). To assert a viable cause of action for inadequate medical care, an inmate must first state facts sufficient to allege that the plaintiff has a serious medical need for which adequate care has not been provided.  Farmer, 511 U.S. at 831; Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Estelle, 429 U.S. at 106.  The inmate must then allege that a responsible prison official was aware of the need or of the facts from which the need could be inferred, and still failed to provide treatment.  Estelle, 429 U.S. at 106. A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated.  Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); Kosilek v. Maloney, 221 F. Supp. 2d 156, 180 (D. Mass. 2002) (citing Farmer, 511 U.S. at 835–47); see also Gaudreault v. Mun'y of Salem, Mass., 923 F.2d

34

203, 208 (1st Cir. 1990) (defining a serious medical need as one "'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'").  The Eighth Amendment guarantee of adequate medical care applies to a prison's provision of mental health care.  See DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991); Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (recognizing deliberate indifference to an inmate's mental health needs violates the Eighth Amendment).

"Adequate medical care" is treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in the community, tailored to an inmate's particular medical needs, and that are based on medical considerations.  See United States v. DeCologero, 821 F.2d 39, 42–43 (1st Cir. 1987).  This does not mean that an inmate is entitled to the care of his or her choice, but simply that the care must meet minimal standards of adequacy. Deliberate indifference occurs where the medical care provided is "so clearly inadequate as to amount to a refusal to provide essential care." Torraco, 923 F.2d at 234.  Constraints inherent

35

in a prison setting may affect the choice of care provided, and may be relevant to whether or not prison officials provided inadequate care with a deliberately indifferent mental state. Wilson v. Seiter, 501 U.S. 294, 302 (1991).

Johnson has alleged a serious mental health condition that was identified by professional mental health personnel at the NCF as requiring both medication and cell feeds. Johnson has also alleged that defendant Thyng was aware of Johnson's need for cell feeds and denied them to him nonetheless. I find, therefore, that Johnson has adequately alleged a claim of deprivation of adequate mental health care against Thyng which I will direct to be served in my Simultaneous Order.

VI.   Equal Protection

Johnson asserts that defendants violated his Fourteenth Amendment right to the equal protection of the laws when they denied him services discriminatorily because he is a convicted sex offender, and because he is disabled by a mental illness. The Equal Protection Clause requires states to treat similarly situated persons alike. Plyler v. Doe, 457 U.S. 202, 216 (1982); Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006), cert. denied, Univ. of P.R. v. Toledo, ___ U.S. ___, 127 S. Ct. 1826 (2007).

The disabled are not a suspect class for equal protection purposes.  Toledo, 454 F.3d at 33 (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  As such, "if special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause."  Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 368 (2001).  The ADA is such a positive law, which requires states to provide special accommodations for the disabled, and, therefore, is the more appropriate avenue for the relief sought here than the Equal Protection Clause.  Tennessee v. Lane, 541 U.S. 509, 549 (2004).

Additionally, Johnson has proffered no facts which would indicate that his status as a sex offender warrants membership in a protected class of persons, nor that he was treated differently than other similarly situated persons.  Therefore, I find that Johnson has not alleged any facts that state a claim for an Equal Protection Clause violation, and I recommend that Johnson's equal protection claim be dismissed from this action.

VII. ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be

37

excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."  42 U.S.C. §

12132.

> Pursuant to the plain language of Title II, a plaintiff
> must establish: (1) that he is a qualified individual
> with a disability; (2) that he was either excluded from
> participation in or denied the benefits of some public
> entity's services, programs, or activities or was
> otherwise discriminated against; and (3) that such
> exclusion, denial of benefits, or discrimination was by
> reason of the plaintiff's disability.

Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000).

Title II of the ADA applies to inmates in correctional

facilities.  See Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206,

209-10 (1998).  "[P]risons provide inmates with many recreational

activities, . . . services, and educational and vocational

programs, all of which at least theoretically benefit the

prisoners (and any of which disabled prisoners could be excluded

from participation in.)"  Id. at 210 (internal citations

omitted).

Here, Johnson asserts that his mental illness renders him a

qualified individual with a disability.  Accepting this assertion

as true for purposes of preliminary review, I must determine

whether or not Johnson has alleged that he was denied some

service, program or activity, "or was otherwise discriminated against" by virtue of his disability.  Specifically, Johnson alleges here that the removal of cell feeds prescribed by his mental health professional deprived him of a benefit or service that was prescribed for him in order to accommodate his mental illness.  Johnson has stated sufficient facts to demonstrate that, in fact, a cell feed was a reasonable means of accommodating his mental health needs.  Johnson has further related that cell feeds were denied to him by his unit manager, defendant Thyng, who was not a mental health professional, after being prescribed for him by his treating mental health professional.  Accordingly, in addition to stating an Eighth Amendment violation on these facts, I find that Johnson has stated sufficient facts to assert a claim under the ADA, and I direct, therefore, that the ADA claim be served against defendant Thyng.

VIII. <u>Loss of Job and Pay</u>

Johnson claims that he was denied due process when he was fired from his prison job.  He alleges that Bachofer improperly terminated his employment based on a false allegation that Johnson was perusing child pornography on the library computers.

"[I]t is clear that unless state laws or regulations are to the contrary, prisoners have no vested property or liberty rights to either obtain or maintain prison jobs." <u>Dupont v. Saunders</u>, 800 F.2d 8, 10 (1st Cir. 1986).  New Hampshire law does not create any property or liberty interest in employment for prisoners. <u>See</u> <u>Brennan v. Cunningham</u>, 126 N.H. 600, 605, 493 A.2d 1213, 1216 (1985) (holding that no liberty interest implicated by Warden's exercise of discretion in transferring a prisoner that results in his inability to work).  Johnson, therefore, lacks any federal due process claim with respect to being denied employment while incarcerated, and I recommend this claim be dismissed.

IX.  <u>Defamation</u>

Johnson has also alleged a state law claim for defamation. Under New Hampshire law, "to establish defamation, there must be evidence that a defendant published a false and defamatory statement of fact about the plaintiff to a third party." <u>Moss v. Camp Pemigewassett, Inc.</u>, 312 F.3d 503, 507 (1st Cir. 2002) (quoting <u>Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc.</u>, 138 N.H. 110, 118, 635 A.2d 481, 492 (1983)) (other internal citations omitted).  "A statement is defamatory if it 'tends to lower the plaintiff in the esteem of any substantial

40

and respectable group of people.'"  <u>Moss</u>, 312 F.3d at 507 (citing

<u>Nash v. Keene Publ'g Corp.</u>, 127 N.H. 214, 219, 498 A.2d 348, 351

(1985)).  Johnson alleges that he was falsely accused of looking

at child pornography.  Further, Johnson alleges that the

accusations were repeated by Bachofer to other inmates, which

constitutes publication to a third party.  While it is not clear

whether the inmates who heard the rumors would ultimately be

deemed to be a "respectable group of people," for purposes of

preliminary review, I will accept that they are and find,

therefore, that he has alleged the minimal facts necessary to

state a claim against Bachofer for defamation.  Because Johnson

sets out the basic elements of a defamation suit and this court

has original federal question jurisdiction of Johnson's related

federal claims against the defendants pursuant to 28 U.S.C. §

1331, I will exercise jurisdiction over the state law defamation

claim as I find it may form part of the same case or controversy.

<u>See</u> 28 U.S.C. § 1367(a) (allowing court to exercise supplemental

jurisdiction over state law claims that are "so related to the

claims in the action within the original jurisdiction that they

form part of the same case or controversy); <u>see</u> <u>also</u> <u>United Mine</u>

<u>Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966).  I will therefore

41

direct this claim to be served on defendant Bachofer in my
Simultaneous Order.

X.   Denial of Hygiene Items

"The Constitution 'does not mandate comfortable prisons,'
but neither does it permit inhumane ones." Farmer, 511 U.S. at
832 (quoting Rhodes, 452 U.S. at 349).  Under the Eighth
Amendment, prisoners are entitled to the "minimal civilized
measure of life's necessities." Farmer, 511 U.S. at 834; Rhodes,
452 U.S. at 347.  As stated previously, to successfully allege an
Eighth Amendment violation, a plaintiff must first plead facts
which, if true, establish that a "sufficiently serious"
deprivation occurred.  Seiter, 501 U.S. at 298-99.  A plaintiff
must show that the conditions he was forced to endure were beyond
the bounds of human decency, and that the prison officers
intentionally or recklessly subjected him to those conditions.
See Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("extreme
deprivations are required to make out a conditions-of-confinement
claim"); Seiter, 501 U.S. at 298-301 (same).

Here, Johnson alleges that he made repeated requests for
hygiene items because he had none.  Both Thyng and Blaisdell
refused him items necessary to maintain basic hygiene, either

42

because they felt that his money should have been used for the
hygiene items rather than for making copies of legal documents,
or because they believed he should still have items previously
issued to him.  The facts related to the actual deprivation of
needed items, however, as alleged by Johnson, are that he was
deprived of both soap and razors for a period of time long enough
for him to develop sores and a rash from the lack of soap, and
for him to grow enough of a beard to be charged with a
disciplinary action for failing to shave.  As such, I find that
Johnson has alleged the minimum facts necessary to state a claim
for a deprivation of a "minimal civilized measure of life's
necessities" to violate the Eighth Amendment guarantee of humane
conditions of confinement.  I will direct, therefore, in my
Simultaneous Order, that his claim be served on defendants Thyng
and Blaisdell.

XI.  Retaliation

     Johnson alleges that a number of the adverse actions taken
against him were a result of retaliation on the part of prison
officials.  Johnson's complaint is not entirely clear, however,
as to whether he makes the distinction between an action taken
against him that retaliates against him for the exercise of his

43

First Amendment right to petition the government for a redress of grievances by engaging in litigation against prison employees, or whether he is claiming that he was retaliated against for allegedly engaging in the viewing of child pornography in the law library.[11]  As best I can, construing the allegations generally, I will address Johnson's claim that he was retaliated against for exercising his First Amendment right to access the courts, which gives rise to a retaliation claim cognizable under § 1983. Beauchamp v. Murphy, 37 F.3d 700, 710 (1st Cir. 1994); see also Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) ("[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."); Oropallo v. Parrish, No. 93-1953, 1994 WL 168519, at *3 (D.N.H. May 5, 1994), aff'd, 23 F.3d 394 (1st Cir. 1994) (citing Ferranti v. Moran, 618 F.2d 888, 892 n.4 (1st Cir. 1980) ("[A]ctions otherwise supportable lose their

---

[11]Johnson denies looking at child pornography.  To the extent that he alleges that he was retaliated against because the defendants' believed that he was looking at child pornography and were retaliating against him for that behavior, the claim is subsumed by his due process claim that alleged that Thyng barred him from the NCF libraries for that uncharged conduct as well as for conduct that was charged as a disciplinary violation.

legitimacy if designed to punish or deter an exercise of constitutional freedoms.") (citation omitted)); see Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993), cert. denied, 512 U.S. 1209 (1994) (prison officials cannot lawfully impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right).

As previously noted, prison officials may make policy that is reasonably related to legitimate penological interests, even at the expense of certain constitutional rights. See Beard v. Banks, ___ U.S. ___, 126 S.Ct. 2572, 2579 (2006) (citing Turner, 482 U.S. at 89–90).  In order to state a retaliation claim for an exercise of First Amendment rights, an inmate must allege: (1) the conduct which led to the alleged retaliation was protected by the First Amendment, (2) some adverse action at the hands of the prison officials, and (3) a causal link between the exercise of the inmate's First Amendment rights and the adverse action.  See Price v. Wall, 464 F. Supp. 2d 90, 96 (D.R.I. 2006); see also LaFauci v. N.H. Dep't of Corr., No. Civ. 99–597–PB, 2005 WL 419691, at *7 (D.N.H. Feb. 23, 2004) (Unpublished Order).  I consider each of these elements of a retaliation claim in turn.

Here, Johnson has alleged either that he was engaged in

45

litigation against employees of NCF, including some or all of the defendants, or that he threatened such litigation, on the basis that the treatment and conditions of his confinement at NCF violated his constitutional rights.  Because Johnson's prior and future litigation is protected by the First Amendment as an exercise of his right to petition the government to redress grievances, Johnson has alleged sufficient facts to satisfy the first requirement for stating a retaliation claim.

To state an adverse action, plaintiff must allege that the defendants subjected him to "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her Constitutional rights."  Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001), overruled in part on other grounds by Phelps v. Kapnolas, 308 F.3d 180, 187 n.6 (2d Cir. 2002); see Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999).  Even if a particular inmate is not chilled in his expression, a claim for retaliation may still arise if the retaliatory behavior alleged is objectively sufficient and onerous to deter an ordinary person from exercising his rights.  Gay v. Shannon, No. Civ.A. 02-4693, 2005 WL 756731, at *8 (E.D.Pa. 2005) (citing Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).

Johnson alleges that, as acts of retaliation, the defendants (i) banned him from the law and recreational libraries, (ii) severely limited or eliminated his ability to conduct legal research, obtain photocopies, and notarize documents, (iii) pursued disciplinary actions against him for using the library's legal and copy services, (iv) spread rumors about him that endangered his safety and then failed to adequately protect him from the dangerous environment they created, (v) removed him from cell feeds that had been prescribed to treat his mental illness, and (vi) denied him access to necessary hygiene items.  I find that an inmate of ordinary firmness might well be chilled in his efforts to litigate his grievances against the prison, administratively and in the courts, if his efforts to do so were expected to be rewarded with such acts in response.  Johnson, therefore, has stated sufficient facts to allege that adverse actions were taken against him that would chill an ordinary inmate in his situation from exercising his First Amendment right to petition the government for a redress of grievances, satisfying the second element of a retaliation claim.

Finally, Johnson must allege facts that, if true, would demonstrate that the adverse actions alleged were taken in order

to retaliate against Johnson for the exercise of his First
Amendment rights.  Circumstantial evidence is often enough to
support a claim that an adverse action was taken with retaliatory
intent, as intentions are often difficult to prove through direct
evidence.  See Beauchamp, 37 F.3d at 711; Ferranti, 618 F.2d at
892 (chronology of events provided support for inference of
retaliation); McDonald, 610 F.2d at 18 (same).

While the allegations in the complaint may fall short of
assuring that Johnson will succeed in proving the causal link
between his litigation and the acts alleged, he has sufficiently
connected the retaliatory acts with the knowing undermining of
his litigation efforts for the claim to survive this preliminary
review.  All the acts alleged followed in short order the
original library incidents of March 2007.  I find that these
events, considered together, allege sufficient circumstantial
evidence of an intent to retaliate against Johnson for the
exercise of his First Amendment rights to meet the third
requirement for a retaliation claim.  Accordingly, I find that
Johnson has stated a retaliation claim upon which relief may be
granted, and I direct that this action be served on defendants
Thyng, Poulin, Mailhot, Cox, Bachofer, and Blaisdell.

XII. <u>Choice of Defendants</u>

    A.   <u>Official Capacity Suits</u>

    Section § 1983 authorizes suits against state actors operating to deprive citizens of their constitutional rights. Because I have found that Johnson has alleged constitutional violations against a number of the state defendants sufficient to state a cause of action under § 1983, those individuals –– defendants Thyng, Blaisdell, Wrenn, Kench, Wilson, Poulin, Cox, Bachofer, and Mailhot –– will be defendants to this suit in their individual capacities.

    Johnson also sued the defendants in their official capacities.  It is well-settled that the Eleventh Amendment bars suits against state entities and state agents working in their official capacities unless the state has expressly waived immunity, which has not been done by New Hampshire for actions brought under § 1983.  <u>See</u> <u>P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 144 (1993) (absent waiver, neither a State nor agencies acting under its control may be subject to suit in federal court); <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989) (holding that neither a state nor its officials acting in their official capacities are "persons" under

§ 1983).  Official capacity suits against officers of an agency are simply "another way of pleading an action against an entity of which an officer is an agent."  <u>Monell</u>, 436 U.S. at 690 n.55. Accordingly, I recommend dismissal of all of the official capacity claims against the defendants to this action.

      B.   <u>Supervisory Liability</u>

    "Supervisory liability under § 1983 cannot be predicated on a respondeat [superior] theory, but only on the basis of the supervisor's own acts or omissions."  <u>Aponte Matos v. Toledo Davila</u>, 135 F.3d 182, 192 (1st Cir. 1998) (internal citations omitted).  A supervisor, to be liable for the acts of those who serve underneath him, must have been either "a primary actor involved in, or a prime mover behind, the underlying violation." <u>Camilo-Robles v. Zapata</u>, 175 F.3d 41, 43-44 (1st Cir. 1999). There must be "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" of the violation alleged.  <u>Id.</u> at 44.

    Johnson has named Blaisdell, Wrenn, Kench, Thyng, and Cox as defendants to this action in their supervisory capacities. Johnson bases his allegation of supervisory liability on the fact that, through Johnson's grievances and appeals, the supervisory

defendants were aware of violations of Johnson's constitutional and statutory rights, and yet they failed to remedy those violations.  Instead, the supervisory defendants lack of remedial response either explicitly or implicitly approved and supported their subordinates' actions that caused the deprivations at issue here.  Johnson has, therefore, sufficiently alleged that Blaisdell, Wrenn, Kench, Thyng, and Cox were responsible for the right of access, due process, inadequate mental health, and denial of hygiene items claims, and I direct that those claims be served against those defendants in their individual supervisory capacities.

<u>Conclusion</u>

For the foregoing reasons, I recommend dismissal of the denial of the right of access to attorney disciplinary proceedings claim, the denial of procedural due process at a disciplinary hearing claim, the denial of access to the courts based on the denial of typewriter ribbons claim, the equal protection claim, the loss of prison job claim, and the endangerment claim as alleged against Cox, Poulin, and Thyng be dismissed from this action.  In the Simultaneous Order, I direct

that the remaining claims be served on defendants as set forth in detail above.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge

Date:     September 12, 2007

cc:       Gary DeWayne Johnson, pro se